IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TRINA WRIGHT,

      Plaintiff,

                                    Civil Action 2:12-cv-112
    v.                           Judge George C. Smith
                                      Magistrate Judge Elizabeth P. Deavers

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Trina Wright, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), and the administrative record (ECF No. 9).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff Wright maintains that she became disabled on October 1, 2005, at age 35, due to a seizure disorder, bipolar disorder, asthma, a learning disorder, bladder leakage, swelling in legs and feet, partial hysterectomy, and headaches.  (R. at 196, 200.)  On August 31, 2006, Plaintiff protectively filed her application for supplemental security income.  (R. at 179-84.)  Plaintiff's

application was denied throughout the administrative process, which included a remand by the Appeals Council.  (R. at 58–84.)

Upon remand, Administrative Law Judge Timothy G. Keller ("ALJ") held a hearing on September 2, 2010, and a second hearing on December 7, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 39-41, 46-53.)  Vocational Expert Barry Brown ("VE") also appeared and testified at the December 7, 2010 hearing.  (R. at 54-56.)  On January 5, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9-17.)  On December 7, 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-3.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the December 7, 2010 administrative hearing that she cannot work due to memory loss and confusion, which she alleged prevent her from learning her job responsibilities.  (R. at 48.)  She attributes these symptoms to her seizures.  (*Id*.)  Plaintiff represented that she experiences two to three seizures per week, three to ten minutes in duration, and all of which result in loss of consciousness followed by headaches, confusion, and memory loss lasting for three to seven days.  (*Id*.)

Plaintiff indicated that she takes medication for her seizures and headaches, but does not consistently take this medication.  (R. at 49-50.)  She also takes medication to treat bipolar disorder, depression, and anxiety.  (R. at 50-51.)  She testified that she becomes "very angry" when she does not take her medications and suffers approximately two spells of depression every

2

two weeks, even when taking medications.  Plaintiff further testified that during a depression

spell, she sleeps fourteen hours per day, nine of which is during the daytime.  (R. at 51.)

Approximately one year prior to the hearing, Plaintiff attended an online college.  (R. at

52.)  She testified that she was "let go" from her last full-time job as a daycare worker because of

her seizures.  (R. at 52-53.)

**B.**     **Vocational Expert Testimony**

The ALJ asked the VE to consider whether Plaintiff would be able to perform any work

in the regional or national economy if he found that she had the following abilities and

limitations:  capable of lifting, carrying, pushing, and pulling fifty pounds occasionally and

twenty-five pounds frequently; could sit, stand, and walk for six hours each out of an eight-hour

workday; could never climb ladders, ropes or scaffolding, could not be exposed to moving

machinery or unprotected heights; could not have concentrated exposure to dust, fumes, and

gases.  (R. at 54-55.)  The ALJ also added the following mental description:  retains the ability to

understand, remember, and carry out simple tasks and instructions; able to maintain

concentration and attention for two-hour segments over an eight-hour work period; able to

respond appropriately to supervisors and coworkers; and able to adapt to simple changes and

avoid hazards in a setting without strict production demands."  (*Id.*)  Based upon this

hypothetical, the VE testified that Plaintiff could perform unskilled jobs found at all exertional

levels.  (R. at 55.)  According to the VE, representative positions included exertional machine

tender, with 500 jobs locally and 75,000 nationally; a light exertional inspector, with 600 jobs

locally and 70,000 nationally; and light exertional office helper with 2,000 jobs locally and

275,000 nationally.  (*Id.*)

### III.  EDUCATION RECORDS

Records from Columbus City Schools show that Plaintiff underwent the Wechsler Intelligence Scale for Children-R (WISC-R), on October 11, 1978, when she was eight-years old. She obtained a verbal IQ score of 101, a performance IQ score of 87, and a full scale IQ score of 93.  (R. at 325.)

### IV.  MEDICAL RECORDS[1]

**A.  The Southeast Recovery Inc./4th Street Clinic**

The record contains a copy of Plaintiff's treatment notes from The Southeast Recovery Inc./4th Street Clinic ("Southeast") dated from March 29, 2006, through June 24, 2008.  (R. at 311-19, 1269-84.)  When psychiatrist George Learmonth, M.D. initially evaluated Plaintiff in March 2006, she complained of a longstanding history of depression, difficulty with her concentration and memory, and feeling apathetic and sedated.  (R. at 317.)  Plaintiff reported that she was in special education in school; experienced a closed head trauma at the age of 13, with resultant and chronic petit mal seizures; was sexually abused by her father until the age of 13; and two-month old child had died ten years earlier.  Dr. Learmonth assessed that Plaintiff presented as being overly sedated, as she acted "a bit like a zombie."  (*Id.*)  He noted that Plaintiff was "slow, deliberate, and hesitating" in her responses to questions.  He speculated that this could be attributable to excessive sedating medication.  During the mental status

---

[1]The Undersigned recognizes that Plaintiff alleges disability in part because of her physical impairments.  The medical records indicate that Plaintiff has received treatment for various conditions, including a seizure disorder and migraine headaches.  Both the ALJ and the Appeals Council assigned exertional limitations to accommodate these conditions.  Plaintiff's Statement of Errors, however, focuses primarily on Plaintiff's mental impairments and limitations.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's mental impairments and limitations.

examination, Plaintiff had a constricted affect and only occasionally smiled.  Dr. Learmonth

noted Plaintiff primarily appeared to be serious and worried.  He found no evidence of

hallucinations or delusions, and Plaintiff presented as alert and fully oriented.  Her overall level

of intellectual functioning was estimated to be below average.  Dr. Learmonth assessed that

Plaintiff's insight and judgment were both poor.  He diagnosed Plaintiff with a major depressive

disorder and personalty disorder.  (R. at 318.)  He assigned her a Global Assessment of

Functioning ("GAF") score of 50.[2]  (*Id.*)  Dr. Learmonth recommended that Plaintiff discontinue

taking some of her sedating medications.  He added Prozac, Trazodone, and Ativan to her

medication regimen.  (*Id.*)

In June 2006, Plaintiff reported to Dr. Learmonth that she was "doing quite well."  Dr.

Learmonth observed that Plaintiff was clean and very informally dressed; exhibited a friendly

and cooperative affect; was alert and oriented; demonstrated an average level of intelligence,

knowledge, and vocabulary; and showed no evidence of major disorder of thought.  (R. at 314.)

Dr. Learmonth diagnosed Plaintiff with a type II bipolar disorder and a generalized anxiety

disorder.  (*Id.*)

Eric L. Kahn, M.D., a treating psychiatrist, along with Mary Ann Picard, RN, were

responsible for Plaintiff's medication management from mid-2007 until September 2008.  (*See*

R. at 1265, 1267-84.)  During Plaintiff's appointments with Dr. Kahn, she primarily spoke about

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of
functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating
whether the individual is functioning at the higher or lower end of the range.  *See* Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision
at pp. 32-34 ("DSM-IV-TR").  A GAF score of 50 is indicative of "severe symptoms ... or
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep
a job)...." *Id.* at 34.

her neurologist and expressed some somatic complaints, but rarely complained of emotional symptoms.  (*Id.*)  Plaintiff reported that she had stopped taking her depression medication two months prior.  She also complained that she should could not find anyone to prescribe her favorite pain medication to treat her headaches and asked Dr. Kahn to prescribe it.  Dr. Kahn also refused to prescribe the medication she requested.  (R. at 1265.)

Kimberly Smith, a licensed practicing clinical counselor ("Ms. Smith"), and Dr. Kahn completed a mental source statement as to Plaintiff's mental capacity on June 24, 2008.  (R. at 849-50.)  They opined that Plaintiff has poor or no useful ability to function in a competitive setting in the following areas:  maintain attention and concentration for extended periods of two-hour segments; maintain regular attendance and be punctual within customary tolerances; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stress; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember, and carry out simple job instructions.  (*Id.*)  According to Ms. Smith and Dr. Kahn, Plaintiff had a "fair" ability to function, which is defined on the form as "seriously limited but not precluded . . . [m]ay need special consideration and attention," in the following areas:  follow work rules; use judgment; respond appropriately to changes in routine setting; deal with the public; relate to co-workers; interact with supervisors; maintain appearance; socialize; behave in an emotionally stable manner; relate predictably in social situations; management of funds/schedules; and to leave home on her own.  (*Id.*)

6

Plaintiff continued to receive treatment for dysthymia with anxiety, personality disorder, pseudo-seizures, and medication management at Southeast through July 9, 2010. (R. at 1262-68, 1338-48, 1406-25.) The record reflects, however, that there are significant gaps in Plaintiff's mental health treatment during which she took no psychotropic medication. (*See* R. at 1338, 1406, 1410.) When Plaintiff presented to Ms. Smith in September 2008, she had no unusual ideation; was appropriately dressed and groomed; and exhibited a bright affect, rational thoughts, fair judgment and insight, and normal speech. (R. at 1266.) Plaintiff reported that she was starting a new job the very next day and felt "good" and "capable" of this new undertaking. Ms. Smith noted Plaintiff seemed to be "functioning fairly well." (R. at 1266.)

In February 2009, Plaintiff reported that she was experiencing mood problems and depression. Ms. Smith observed, however, that Plaintiff "seems stable" and "does not appear to be depressed." (R. at 1346.) She described Plaintiff's mood as "euthymic" and her affect as "calm and cooperative." (*Id.*) Plaintiff reported that her "main problem" was financial. (*Id.*) Ms. Smith observed that "even [Plaintiff's financial problems do] not seem to be causing too much worry." (*Id.*) Ms. Smith further described Plaintiff as "content" and noted that Plaintiff reported that she would be getting married to an old boyfriend soon. (*Id.*) Ms. Smith concluded that "[a]s a matter of observation, her psychiatric symptoms seem to be in remission." (*Id.*)

In March 2009, Plaintiff reported increased stress attributable to her former husband threatening her to return money and her daughter going to court on truancy charges. (R. at 1343.) Notwithstanding these stressors, Mr. Smith described her mood as "euthymic," her affect as "improved" and "good," and noted that Plaintiff appeared to be stable. (*Id.*) Plaintiff also reported that she was taking on-line classes in psychology. (*Id.*)

In May 2009, Plaintiff reported that she had not been taking anti-depressant medication for five months and reported that she was "very anxious." (R. at 1340.) Ms. Smith again observed that Plaintiff exhibited a euthymic mood; a calm and cooperative affect; rational thoughts; normal speech; and poor to fair judgment and fair insight. (R. at 1339.) Ms. Smith noted that Plaintiff appeared psychiatrically stable and had thoughts that were rational, linear, and goal-focused. (*Id.*)

In January 2010, Certified Nurse Practitioner Kathy Lane noted that Plaintiff had last been treated in July 2009 and that she had "long ago run out of medication." (R. at 1410-11.) Plaintiff's mental status examination was unremarkable. (R. at 1410-11.) Plaintiff reported that she was in pain and that her pain management doctor refused to continue to treat her because she filled pain medication prescriptions from another doctor. Although Plaintiff reported that she had been depressed, Ms. Lane observed her mood to be "neutral" and her affect to be "stable and appropriate." (*Id.*) Plaintiff next reported for treatment in April 2010. Ms. Lane described Plaintiff's mood as "euthymic" and her affect as "stable and appropriate." (R. at 1408.) Plaintiff did not seek treatment again until July 2010, at which time Ms. Lane noted that she had "not missed appointments but rather has not made any." (R. at 1406-07.) Prior to Plaintiff's arrival, Mses. Lane and Smith "speculated whether or not [Plaintiff] should remain as a patient [at Southeast] because she could easily transfer her case to a primary care physician." (R. at 1406-07.) Plaintiff, however, "insisted that she was ready and needing to get back into treatment." (*Id.*) Ms. Lane found Plaintiff to be alert and oriented in all spheres and described her mood as "euthymic" and affect as "stable and appropriate." Ms. Lane also noted that Plaintiff was "neat

and clean"; had good rapport; exhibited intact memory and cognition; and demonstrated fair to good insight and judgment.  (*Id*.)

**B.     Rodney Swearingen, Ph.D.**

In November 2005, Rodney Swearingen, Ph.D. conducted a psychological examination of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 336-43.)  Plaintiff conveyed that she believed herself to be disabled due to her seizures and "confusion."  (R. at 337.)  Plaintiff reported that she had earned her high school equivalence diploma and took computer classes after high school.  (R. at 338.)  She represented that she was not in special education classes in school.  (*Id.*)  She denied any history of physical or sexual abuse and indicated that she had a lot of contact with both of her parents and her siblings.  (R. at 337.)

During the mental status evaluation, Dr. Swearingen noted that Plaintiff's processing speed appeared slow and disrupted.  (R. at 339.)  Plaintiff spoke directly, but slowly.  He noted that Plaintiff displayed no evidence of any flight of ideas, speech impediment, or perseveration and that her associations were circumstantial at times.  Plaintiff reported confusion.  (*Id.*)  Dr. Swearingen described Plaintiff's affect as reactive and her "prevailing mood" as depressed.  (*Id*.)  Plaintiff reported feeling anxious and nervous about the noise and confusion around her.  (*Id*.)

Dr. Swearingen measured Plaintiff's immediate auditory memory skills, her ability to think, and her word knowledge and understanding of verbal concepts as below average.  (R. at 340.)  He described her concentration as disrupted, but noted that she was on task.  He found Plaintiff's task persistence to be average, her work pace to be slow, and her motor skills to be depressed.  He noted that Plaintiff exhibited little difficulty understanding or following directions.  (*Id*.)

Plaintiff's IQ testing revealed a verbal IQ of 79, processing IQ of 73, and full-scale IQ of 74, which placed her in the borderline range.  (R at 340.)  On the Wide Range Achievement Test-III (WRAT-III), Plaintiff obtained a reading standard score of 102 (post-high school level).  (*Id*.)  Dr. Swearingen diagnosed Plaintiff with a cognitive disorder, not otherwise specified and a mood disorder due to seizures.  (R. at 341.)  He assigned Plaintiff a GAF score of 45.[3]

Dr. Swearingen opined that Plaintiff is moderately impaired in her ability to relate to others on the job.  He explained that Plaintiff reported that she had some difficulty getting along with others in the past.  He added that he found Plaintiff to be cooperative during the evaluation.  He also opined that Plaintiff's reported mood symptoms and confusion may impact her ability to relate with others.  (R at 341.)  He found that given Plaintiff's estimated intellectual capabilities, she would be mildly to moderately impaired in her ability to follow direction.  (R. at 342.)  Dr. Swearingen concluded that Plaintiff would have no difficulties comprehending, remembering, or carrying out simple one- and two-step tasks and that she would be able to perform multiple-step tasks.  He noted, however, that she may have some difficulty understanding complex or complicated work instructions based upon her reported confusion.  Dr. Swearingen further opined that Plaintiff would be moderately impaired in her ability to perform repetitive tasks.  He explained that Plaintiff was able to perform repetitive tasks in connection with the evaluation, but that she did so slowly.  Finally, he found Plaintiff ability to cope with stress to be "moderately severely impaired," noting that she had reported poor coping in the past; mood symptoms; confusion; and increased seizures.  (*Id.*)

---

[3]A GAF score of 41-50 is indicative of "severe symptoms . . . or  serious impairment in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job) . . . ." DSM-IV-TR at 32-34.

C.    **Todd Finnerty, Psy.D./John Waddell, Ph.D.**

On November 20, 2006, Todd Finnerty, Psy.D., a state-agency psychologist, performed a mental functional capacity assessment and completed a psychiatric review.  (R. at 345-62.)  Dr. Finnerty opined that Plaintiff was moderately impaired in her activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  (R. at 359.)  He found that Plaintiff had experienced no episodes of decompensation of an extended duration. (*Id.*)  He further determined that the evidence did not establish the presence of the requisite mental impairments and work-related limitations.  (R. at 360.)  In a narrative assessment of Plaintiff's ability to engage in work-related activities from a mental standpoint, Dr. Finnerty concluded that Plaintiff was able to perform simple, three- to four-step tasks and would work best in an environment that did not have strict production demands or frequent changes.  (R. at 347.)  John Waddell, Ph.D., also a state-agency psychologist, affirmed Dr. Finnerty's opinion in July 2007.  (R. at 512.)

D.    **John L. Tilley, Psy.D.**

John L. Tilley, Psy.D. evaluated Plaintiff on February 5, 2007, to determine services through the Ohio Department of Jobs and Family Services.  (R. at 490- 503.)  During this evaluation, Plaintiff had difficulty recalling her childhood and upbringing, but denied any history of childhood abuse, neglect, or psychological trauma.  (R. at 491.)  She reported that she earned her graduate equivalency diploma in 1996 and earned certification as an office systems specialist in 1995 through the North Adult Education Center.  (*Id.*)

IQ testing revealed a performance IQ of 73 and a verbal IQ of 73 and full-scale IQ of 70. (R. at 494.)  Additional testing revealed significant difficulty in retrieving recently learned

information.  (*Id.*)  Dr. Tilley diagnosed a mood disorder not otherwise specified and borderline intellectual functioning.  (R. at 500.)  He assigned Plaintiff a GAF score of 48.  (*Id.*)

Dr. Tilley concluded that from a purely psychological perspective, Plaintiff was unemployable and her mental functional impairments were expected to last nine to eleven months with continued treatment of her mood disorder.  (R. at 500.)  Dr. Tilley further noted that although Plaintiff's cognitive limitations will not serve as a terminal barrier to future employability, they will limit her occupational options to some degree.  (*Id.*)  He recommended that Plaintiff meet with a professional to assist her in identifying suitable employment in order maximize the likelihood of job satisfaction and reduce the likelihood of job turnover.  (*Id.*)  Dr. Tilley found that Plaintiff's cognitive impairments would also significantly impair her ability to manage her own finances. (R. at 501.)

Dr. Tilley completed a mental functional capacity assessment and opined that Plaintiff was moderately limited in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (R. at 502.)  He further opined that these limitations were expected to last between nine and eleven

12

months.  (R. at 503.)  He found that she had no limitations or was not significantly limited in ten

other categories of mental, work-related functions.

**E.      Scott Donaldson, Ph.D.**

Plaintiff was again evaluated for disability purposes on May 19, 2010, by Scott

Donaldson, Ph.D.  (R. at 1373-81.)  Dr. Donaldson reported that Plaintiff appeared

uncomfortable during the examination, but "appeared to relax as the examination progressed."

(R. at 1378.)  Plaintiff reported that she got along adequately with neighbors, clerks in stores,

and people in public agencies.  (*Id.*)  She also reported that she had been enrolled in a Special

Education program while in school.  (*Id.*)  She admitted abusing prescription drugs, but reported

that she had not done so for the past two years.  (R. at 1377.)  Plaintiff reported suffering from

mood swings.  She endorsed diminished interest in activities, weight loss, insomnia,

psychomotor agitation and retardation, fatigue, feelings of worthlessness, inability to

concentrate, and decreases in libido and energy.  (R. at 1378-79.)  Plaintiff also endorsed suicidal

ideation without plan, obsessive thoughts, excessive worry, muscle tension, and paranoid

ideation.  (*Id.*)  She further reported, however, that she had not suffered from periods of

anhedonia and that she enjoys music.  (R. at 1378.)  She reported that her daily activities

included watching television, cooking, cleaning, doing laundry, grocery shopping, driving when

necessary, and attending church weekly.

Dr. Donaldson described Plaintiff's affect as "not appropriate as she was both agitated

and depressed and reported that she is not overly impulsive, compulsive or involved in activities

that have a high probability of painful consequences."  (*Id.*)  He noted that Plaintiff was alert,

oriented, and did not manifest signs of confusion.  (R. at 1379.)  Dr. Donaldson also noted that

Plaintiff's speech patterns fell within normal limits, she had no difficulty elaborating on her responses, and her answers were goal-oriented and well-organized.  (R. at 1378.)

Dr. Donaldson diagnosed Plaintiff with major depressive disorder, bereavement disorder, and generalized anxiety disorder.  (R. at 1380.)  He assigned her a GAF score between 45-50. (*Id.*)  He concluded that Plaintiff's ability to understand, remember and carry out one- or two-step job instructions does not appear to be impaired; her ability to perform repetitive tasks does not appear to be limited; and her level of motivation may be moderately limited.  (*Id.*)  He further opined that Plaintiff's ability to attend to relevant stimuli; her interpersonal relationship skills; her ability to relate to supervisors and co-workers; and her ability to withstand the stress and pressures associated with day-to-day work activity also appear to be moderately limited. (*Id.*)

## V.   THE ADMINISTRATIVE DECISION

On January 5, 2011, the ALJ issued his decision.  (R. at 9-11.)  Within that decision, he adopted and incorporated by reference the evidence, testimony, and analysis set forth in his prior September 16, 2009 decision except where otherwise noted.  (R. at 9.)   At step one of the sequential evaluation process,[4] the ALJ found that Plaintiff had not engaged in substantially

---

[4]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?
    2.    Does the claimant suffer from one or more severe impairments?
    3.    Do the claimant's severe impairments, alone or in combination, meet or
          equal the criteria of an impairment set forth in the Commissioner's Listing of
          Impairments, 20 C.F.R. Subpart P, Appendix 1?

gainful activity since August 31, 2006.  (R. at 11.)  The ALJ found that Plaintiff had the following severe impairments: seizure disorder versus pseudoseizures; migraine headaches; learning disorder; major depressive disorder; personality disorder; and ovarian cyst.  (R. at 12.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  In doing so, the ALJ explicitly adopted and incorporated the analysis and conclusion of his prior September 2009 administrative decision (R. at 63-77), noting that the additional evidence Plaintiff submitted continues to support that analysis/finding.  (R. at 12.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full-range of medium work as defined in 20 CFR 416.967(c) with the following abilities and limitations: (1) able to lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently; (2) able to sit, stand, and walk 6 hours each in an 8-hour workday; (3) precluded from climbing ladders, ropes or scaffolds; (4) precluded from exposure to moving machinery or unprotected heights; (5) precluded from concentrated exposure to dust, fumes, and gases; (6) able to understand, remember, and carryout simple tasks and instructions; (7) able to maintain attention and concentration for two hour segments over an 8-hour workday; (8) able to respond appropriately to supervisors and co-workers; and (9) able to adapt to simple changes and avoid hazards in a setting without strict production demands.

(*Id.*)  The ALJ concluded that although Plaintiff's impairments could reasonably be expected

---

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent her statements were inconsistent with the assigned RFC.  (R. at 13.)  In reaching this determination, the ALJ explicitly noted that the mental assessments of the consultative examining psychologists, Drs. Swearingen and Donaldson, are generally consistent with each other and supported by the substantial evidence of record.  He accordingly granted "some weight" to both opinions.  (R. at 14.)  The ALJ accorded the assessments of Ms. Smith and Dr. Kahn "very little weight," explaining that their assessments were not supported by medically acceptable clinical and laboratory diagnostic techniques and, in fact, were inconsistent with not only the other substantial evidence in the record, but also their own treatment notes.  (R. at 14-15.)

Relying on the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (R. at 16.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 16-17.)

## VI.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

16

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.   LEGAL ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ erroneously failed to consider whether her cognitive impairment constituted a Listing level impairment under Listing 12.05(c). She also maintains that the ALJ erred in failing to accord controlling weight to the opinion of Dr. Kahn, her treating physician. Finally, Plaintiff posits that the ALJ's failure to assess and weigh Dr. Tilley's findings renders her unable to fully understand the ALJ's decision and deprives this Court of its ability to review the decision. The Undersigned addresses each of these arguments in turn.

17

**A.      Listing Impairment 12.05(C)**

Plaintiff posits that the ALJ erred in failing to provide explanation as to why Plaintiff does not have an impairment or combination of impairments that meet or equal the definition of mental retardation under Listing 12.05(C).  (Pl.'s Statement of Errors 10, ECF No. 12.)  She further maintains that she is disabled pursuant to Listing 12.05(c).

Plaintiff's first contention of error is not well taken.  Contrary to Plaintiff's assertion, the ALJ *did* consider whether Plaintiff met the requirements of Listing 12.05(C) through his explicit adoption and incorporation of the "evidence analysis, and conclusion of the [December 2009] decision with regard to [Plaintiff] not having an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . noting that additional evidence [Plaintiff] . . . submitted continues to support that analysis/finding . . . ."  (R. at 12.)  Within the ALJ's December 2009 decision, he observed that although Plaintiff's overall level of intellectual functioning fell within the borderline range, the record did not establish that she had satisfied the adaptive deficits Listing 12.05(C) requires.

Further, the Undersigned finds that the ALJ reasonably concluded that Plaintiff's mental impairment failed to meet or satisfy Listing 12.05(C).  A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process.  *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 855 (6th Cir. 1986).  The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Hum. Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or

18

psychological consultants designated by the Commissioner."  20 C.F.R. § 404.1526(c).

Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable

the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of*

*Health & Hum. Servs*., 803 F.2d 211, 214 (6th Cir. 1986).  It is not sufficient to come to close to

meeting the conditions of a Listing.  *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.

1989) (Commissioner's decision affirmed where medical evidence "almost establishes a

disability" under Listing).

     Listing 12.05 covers the impairments related to mental disability. Specifically, Listing

12.05 states:

> Mental retardation refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or supports onset of the
> impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>
>           *            *            *
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional and
> significant work-related limitation of function . . . .

20 C.F.R. 404, Subpt. P, App. 1 § 12.05.  Thus, in order to satisfy Listing 12.05(C), a claimant

must demonstrate the following: (1) he [or she] experiences 'significantly subaverage general

intellectual functioning with deficits in adaptive functioning that initially manifested during the

developmental period' (i.e., the diagnostic description); (2) he [or she] has a 'valid verbal,

performance, or full scale IQ of 60 through 70'; and (3) he [or she] suffers from 'a physical or

other mental impairment imposing an additional and significant work-related limitation of

function.'"  *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697-98 (6th Cir. 2007) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C)).

 To satisfy the diagnostic description, a claimant must demonstrate three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations."  *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009).  A claimant may meet the onset requirement either directly or circumstantially.  Specifically, the Sixth Circuit has found that "[w]hile the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22."  *West*, 240 F. App'x at 699.

 "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills."  *Hayes*, 357 F. App'x at 677.  Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Further, in considering Listing 12.05, the Sixth Circuit has noted that "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'"  *Id.* (quoting DSM-IV-TR at 49).

The plain language of Listing 12.05 does not identify how severe limitations must be to qualify as "deficits in adaptive functioning." *Pendleton v. Comm'r of Soc. Sec.*, No. 1:10–cv–650, 2011 WL 7070519, at *11 (S.D. Ohio Dec. 23, 2011).  Nevertheless, case law from the Sixth Circuit and other federal courts, suggests that a claimant must have relatively significant deficits to satisfy the Listing.  *See, e.g.*, *West*, 240 F. App'x at 698–99 (suggesting that a claimant's ability to understand and retain simple instructions; maintain concentration and attention for basic tasks; interact effectively with co-workers; and deal with work stress all supported a finding of no deficiencies in adaptive functioning); *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815–16 (11th Cir. 2009) (claimant who did well in special education classes; was able to perform several jobs; and who had mild limitations in daily living activities, social functioning, and concentration did not have the type of deficits in adaptive functioning required for Listing 12.05(C)); *McMillan v. Comm'r of Soc. Sec.*, No. 1:10–cv–00308, 2012 WL 90264, at *6 (W.D. Mich Jan. 11, 2012) (holding that insignificant or trivial deficits were not sufficient to satisfy Listing 12.05 and ALJ's finding of moderate restrictions in daily living did not require a finding of deficits in adaptive functioning).

In this case, Plaintiff fails identify any record evidence that would establish that she met the diagnostic description of mental retardation in Listing 12.05(C).  First, Plaintiff offers no evidence to suggest she suffered from significantly subaverage intellectual functioning with deficits in adaptive functioning before age twenty-two.  Significantly, no psychologist or physician has diagnosed Plaintiff with mental retardation.  *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (finding the absence of any mental retardation diagnosis to be a relevant consideration).  Rather, in 2006, treating psychiatrist Dr. Learmonth noted that

21

Plaintiff "shows an average level of intelligence, knowledge, and vocabulary."  (R. at 314.)
Indeed, Plaintiff's childhood IQ tests show that she obtained a verbal IQ score of 101, a
performance IQ score of 87, and a full scale IQ score of 93.  (R. at 325.)  Dr. Swearingen, who
placed Plaintiff's level of cognitive abilities as in the borderline range, opined that this degree of
impairment "may not be an accurate portrayal of her true intellectual functioning."  (R. at 341.)
He explained that "[i]n the past, [Plaintiff] obtained her GED and was never in special education
classes in school."  (*Id*.)  Consistently, state-agency psychologists, Drs. Finnerty and Waddell,
diagnosed Plaintiff with borderline intellectual functioning and explicitly found that Plaintiff did
*not* meet the diagnostic criteria for mental retardation.  (R. at 353, 512.)  Finally, as the ALJ
noted, even Dr. Tilley, the only medical source to assess an IQ score within the range specified
in Listing 12.05(C), declined to diagnose mental retardation, instead assessing Plaintiff's
intellectual functioning as within the borderline range.  (R. at 66, 494.)

　　　　Second, substantial evidence supports the ALJ's conclusion that Plaintiff failed to exhibit
"deficits in adaptive functioning" as required under the diagnostic description for mental
retardation.  The ALJ found no marked limitations in any of the areas of functioning.  In support
of his findings, the ALJ noted that Plaintiff was able serve as the sole parental caregiver to her
two children, prepare simple meals for her family, clean her residence, shop for food and other
necessities, maintain a friendship and dating relationship, handle household finances, provide
childcare for her infant granddaughter, and take online classes in psychology.  (R. at 69, 340.)
The record also reflects that Plaintiff earned her GED and a certification as an office systems
specialist.  (*Id*.)

In sum, contrary to Plaintiff's assertion, the ALJ *did* consider whether or not Plaintiff satisfied Listing 12.05(C).  Further, substantial evidence supports the ALJ's determination that she failed to satisfy the requirements of the listing.

**B.     Consideration of Plaintiff's Medical Sources**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1.    Dr. Kahn

The ALJ considered the assessments that Ms. Smith completed and Dr. Kahn co-signed, but assigned them "very little weight."  He acknowledged that Dr. Kahn is an acceptable medical source and a treating physician/psychiatrist whose opinion must be accorded controlling weight if it is well-supported and not inconsistent with other substantial record evidence and that Ms. Smith is an "other source" whose opinion must be considered.  (R. at 14.)  He explained the weight he assigned as follows:

> The undersigned grants both opinions/mental assessments very little weight because they are not supported by medically acceptable and laboratory diagnostic techniques and, in fact, are inconsistent with not only the other substantial evidence in the record, but those two source's own treatment notes.  A review of the record reveals that Ms. Smith met with the claimant in June 2006, September 2008, February 2009, March 2009, and May 2009, during which time Ms. Smith noted that the claimant reported that she was "doing quite well," was observed as being clean and very informally dressed, had a friendly and cooperative affect, was alert and oriented, showed an average level of intelligence, knowledge, and vocabulary, showed no evidence of major disorder of thought, had no unusual ideation, was appropriately dressed and groomed, had a bright affect, rational thoughts, fair judgment and insight, normal speech, was starting a new job the very next day and felt "good" and "capable" of this new undertaking, was "functioning fairly well," had a euthymic mood and calm and cooperative affect, rational thoughts, normal speech, poor to fair judgment and fair insight, seemed stable, did not appear to be depressed, was taking online courses in psychology, had a cheerful affect, had thoughts that were rational, linear and goal-focused, and/or was psychiatrically stable.  Clearly, these findings, which are the highlights of those treatment notes, do not support the limitations set forth in Ms. Smith's mental assessments.  Further, review of the record reveals that Dr. Eric Kahn met with the claimant in September 2007, and January, February, March, April, May, June, July, and August of 2008, at which time the claimant very rarely complained of psychiatric/emotional symptoms (depression, mood swings, moodiness, crying spells, yelling, anxiety, insomnia), was even less frequently observed as appearing somewhat depressed, subdued, or mildly dysthymic, once talked about her experience in the waiting room, and more frequently spoke about her neurologist and appointments therewith.  Other than the foregoing, no other

psychiatric/emotional abnormalities were noted in Dr. Kahn's treatment notes. Again, clearly Dr. Kahn's treatment notes do not support his findings of the limitations set forth in his mental assessment.

(R. at 15 (internal citations to the record omitted).)

The Undersigned finds no error in the ALJ's treatment of Dr. Kahn's assessment.  The ALJ proffered good reasons for rejecting Dr. Kahn's opinions, and substantial evidence supports his stated reasons.  *See* 20 C.F.R. § 404.1527(d)(3) (identifying "consistency" with the record as a whole and "supportability" as relevant considerations).  As the ALJ noted, the Southeast treatment notes demonstrate that Plaintiff reported doing well and that the she consistently exhibited normal mental status examination findings.  Notably, Dr. Kahn did not have access to Plaintiff's treatment records after he left Southeast in 2008.  (R. at 1265.)  These records reflect that Plaintiff tolerated her psychotropic medications without side effects, that she was frequently observed to be doing well and displaying a euthymic mood, and that she had been seeing a neurologist who prescribed medication that controlled her seizures.  (R. at 1270, 1347, 1374.)  From May 2009 through July 2010, even though Plaintiff treated only sporadically and often did not take anti-depressants, she was consistently observed to display a euthymic mood, was described as psychiatrically stable, and continued to have nomral mental status findings.  (R. at 1340, 1410, 1406, 1408, 1414.)

### 2.      Dr. Tilley

The Undersigned finds Plaintiff's usupported declaration that the ALJ's failure to assess and weigh Dr. Tilley's findings renders her unable to fully understand the ALJ's decision and deprives this Court of its ability to review the decision unpersuasive for a number of reasons.  First, the ALJ *did* discuss Dr. Tilley's opinion and the weight he assigned it in great detail in his

26

September 2009 opinion, which he adopted and incorporated by reference into his January 2011 opinion.  (R. at 9-10, 66, 73.)  Second, Dr. Tilley, who was one of several consultative examiners, is not a treating source who's opinions are subject to *Wilson*'s reason-giving requirements.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (quoting *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that:  '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'").  Finally, the Undersigned finds no error in the ALJ's assessment of Dr. Tilley's opinion.

## VIII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 26, 2013          _____/s/ *Elizabeth A. Preston Deavers*_____
                                                Elizabeth A. Preston Deavers
                                                United States Magistrate Judge